[Cite as *In re S.B.*, 2014-Ohio-4710.]

IN THE COURT OF APPEALS FOR GREENE COUNTY, OHIO

IN THE MATTER OF: S.B.            :
                R.B.

                               :           C.A. CASE NO.    2014 CA 19
                                                       2014 CA 20

                               :

                               :

                               :

                               :

. . . . . . . . . .

**O P I N I O N**

Rendered on the     24th     day of     October    , 2014.

. . . . . . . . . .

BRITTANY M. HENSLEY, Atty. Reg. No. 0086269, Assistant Prosecuting Attorney, 55 Greene Street, Xenia, Ohio 45385
       Attorney for Plaintiff-Appellee

CARL BRYAN, Atty. Reg. No. 0086838, 266 Xenia Avenue, Suite #225, Yellow Springs, Ohio 45387
       Attorney for Defendant-Appellant

DANIEL F. GETTY, Atty. Reg. No. 0074341, 46 East Franklin Street, Centerville, Ohio 45459
       Attorney for Appellee

JOAN ACKERMAN, c/o Greene County Juvenile Court, 2100 Greene Way Blvd., Xenia, Ohio 45385
       Guardian Ad Litem

. . . . . . . . . .

DONOVAN, J.

{¶ 1}  This matter is before the Court on the consolidated Notices of Appeal of R.B.1 ("Mother").  Mother appeals from the April 10, 2014 decisions of the juvenile court in separate cases that granted the Greene County Children Services Board ("CSB") permanent custody of her sons, R.B., whose date of birth is November 13, 2008, and S.B., whose date of birth is October 5, 2005.  We hereby affirm the judgment of the trial court.

{¶ 2}  Regarding R.B., the record reflects that CSB was granted emergency interim custody of the child effective April 1, 2010.  On April 2, 2010, CSB filed a complaint alleging that R.B. is abused and dependent.  The complaint provides as follows:

The agency received a referral on 3-31-10 regarding [R.B.].  He was brought to the hospital by his mother with several injuries.  The initial report was that he had bilateral humerus fractures, a cigarette burn to his abdomen, a contusion on his forehead, a cluster of bruises on his back and several other scrapes and bruises on his head, and body.    * * * [R.B.] also had several lesions around and in his mouth of an unknown origin.  The lesions have tested positive for a virus * * *

[Mother] reports that she let [R.B.] visit with his father [E.M.] since March 27th.  After she remembered her CSB caseworker was coming today she called [E.M.] to have him bring [R.B.] back but he would not answer.  Then later in the day a friend of hers called and said that [R.B.] was at [E.M.'s] sister's house and needed medical attention. [Mother] said she went to pick him up and found him in "bad shape". [Mother] also states that [R.B.] has been with his dad before and has come back with bruises on his head and face but [E.M.] always has an

answer so she let him visit. In December, [Mother] was in jail and her mother, [J.B.] allowed [R.B.] contact with [E.M.],and [Mother] states that [R.B.] came home "beat up", but again the visits continued.

A 9 year old child witnessed [E.M.] pour hot sauce down [R.B.'s] throat and push him down in a tub full of water last month and allegedly this was reported to [Mother], but the visits continued. [Mother] has a history of mental health issues as well as drug use. She admitted that she is using "a friend's xanax" right now, and slept pretty heavy at the hospital, and was not able to get up[] and console [R.B.] while he cried at the hospital.

* * *

The agency has had a voluntary protective services case with [Mother] since May 2009. She has not completed the goals on her case plan. There are concerns about her mental health and drug use.

{¶ 3} Regarding S.B., the record reflects that on April 15, 2010, CSB filed a complaint alleging the child to be dependent based upon the physical abuse of R.B. S.B.'s father is G.M.B.

{¶ 4} A hearing was held on both complaints on July 28, 2010. R.B. was adjudicated abused and dependent, and S.B. was adjudicated dependent. The court returned R.B. to Mother's custody and awarded protective supervision to CSB for both children. An October 15, 2010 case plan required Mother to complete mental health counseling and substance abuse treatment.

{¶ 5} The record reflects that a review hearing was held on April 1, 2011, and the Magistrate's Decision, issued April 6, 2011, provides that Mother "had made progress on the

case plan. However, [Mother] relapsed and was arrested for domestic violence." The court ordered CSB to maintain protective supervision for both children.

{¶ 6} On September 8, 2011, E.M. filed a complaint for legal custody of R.B., and Mother filed a Consent to Change of Legal Custody on the same date. The court scheduled a hearing on the complaint for November 1, 2011.

{¶ 7} On October 28, 2011, CSB filed a Motion to Modify Disposition in both matters. Both motions provide in part that a "case plan and services have been put into place for [Mother]. [Mother] has not been consistent with services. [Mother] has not been able to provide stable housing. [Mother] was incarcerated 8/27/11. Her charges include: forgery and receiving stolen property." The motions sought an award of legal custody to J.B., the children's maternal grandmother, with whom Mother resided.

{¶ 8} After a hearing on November 1, 2011 on the motions of E.M. and CSB, the Magistrate issued a decision in both matters that provides in part as follows:

> Based upon testimony provided, the Court finds that [Mother] has made minimum progress on the case. [Mother] continues to test positive for illegal substances, including cocaine. [Mother] is currently incarcerated.
>
> [E.M.] was convicted of child endangerment. [E.M.] has a past of drug abuse leading to a life of crime and prison. However, today [E.M.] has changed his life around. [E.M.] is a member of Nurturing Fathers for Life, and attends 3-4 AA/NA meetings a day.
>
> * * * The Court acknowledges while [E.M.] has made progress in his life, [J.B.] has provided consistent, stable, support for the minor children.

The court terminated CSB's protective supervision and granted legal custody to J.B.

{¶ 9} On May 15, 2013, CSB filed complaints alleging R.B.'s and S.B.'s dependency. The complaints provide as follows:

[CSB] accepted a dependency report on April 26, 2013. Custodial and maternal grandmother, [J.B.] moved into the Friends Care Community nursing home for rehab from a stroke and left the children in their mother, [R.B.'s] care in approximately March 2013. * * *. Mother is on probation with Greene County Common Pleas Court and was possibly going to jail for probation violations at the time of the report. * * * [J.B.] signed the boys into the temporary custody of the agency on a voluntary 30 day agreement for care.

[J.B.] indicated she will be moving into assisted living at Friends Care Community for long term care due to her medical needs. She will not be working reunification with [S.B.] and [R.B.] [Mother] continues to indicate she would like to work reunification with the boys. She was assessed at TCN and recommended for intensive outpatient treatment until a bed is available at the Women's Recovery Center inpatient treatment.

[CSB] had an open case with [Mother] from March 2009 through January 2012 for [Mother's] substance use and physical abuse involving [R.B.'s] father, [E.M.]

{¶ 10} Also on May 15, 2013, CSB filed motions for predispositional interim orders with supporting affidavits.

{¶ 11} On May 30, 2013, after a hearing, which Mother did not attend, the court granted interim custody of R.B. and S.B. to CSB and ordered Mother "to complete inpatient

substance abuse treatment and follow all recommended after care services, and submit to drug screens."

{¶ 12} On June 19, 2013, an "Affidavit in Support of Location of Parents" was filed in each case by Kelly Muhammad, an employee of CSB. The affidavits provide as follows:

I have attempted to locate [Mother] by the following: I have asked [Mother's] probation officer for information. I have received messages from [Mother's] drug and alcohol counselor through TCN stating that she too has not been able to get a hold of [Mother]. [Mother] gave the agency two numbers to get a hold of her. One of the numbers asked the agency to no longer use that number to attempt to reach [Mother]. The other number stated that the caseworker could leave messages but they were not able to get a hold of [Mother] until [Mother] called her. The caseworker obtained a third number for [Mother] and called. [Mother] and I scheduled to meet at the Clarke Station in Fairborn because [Mother] would not give the caseworker the address to where she was at. The caseworker asked [Mother] where she wanted her mail to go and [Mother] stated that she did not have an address to give the caseworker. [Mother] did not show up to the Clarke Station.

{¶ 13} On July 11, 2013, the court held an adjudicatory/dispositional hearing on CSB's complaints. In its July 16, 2013 decision, the court determined that the "current custodian [J.B.,] was placed in a nursing home due to health reasons and therefore, [is] no longer able to provide care for the minor children. The mother of the minor children is drug dependent and has a warrant out for her arrest. Neither child's father expressed interest in meeting the needs of their

child."[1]

{¶ 14}  On October 29, 2013, CSB filed a "Motion Requesting Modification of Temporary Custody to Permanent Custody" in both cases.  The motions provide in part as follows:

* * * From the time the case opened and transferred for ongoing services 04/30/2013 to mid-August the caseworker was not able to meet with [Mother] due to her lack of cooperation.  Also, during this period, the agency attempted to set up regular visitations between [Mother] and her boys. [Mother] only visited the boys on 05/05/2013 and 07/07/2013.  Both visits were not of her own (sic) but stopping by while the boys visited their grandmother * * * . [Mother] is currently incarcerated as of 08/17/2013.  The caseworker has been able to meet with [Mother] since her incarceration. [Mother] has a court hearing on 11/20/2013. [Mother] states upon release she does not have a place to go.  S.B.'s father has not inquired with the agency after being notified of his son's placement.  R.B.'s father was in contact with the agency upon finding out about his son's placement but then withdrew shortly thereafter.

* * *

{¶ 15}  On January 7, 2014, Kelly Muhammad filed affidavits averring an inability to locate [Mother] and [E.M.].  On January 9, 2014, the Court Appointed Special Advocate for the children, Joan Ackerman, filed preliminary reports that provide that R.B. and S.B. "state they want to live with their maternal grandmother * * * . [J.B.] resides in a nursing home and is no

---

[1]Neither father attended the hearing.

longer able to care for them." The preliminary reports recommend that permanent custody of the boys be awarded to CSB. On January 9, 2014, Ackerman filed a report and recommendations. The report provides in part as follows:

[R.B. and S.B.] lived most of their lives with their maternal grandmother, [J.B.], along with [Mother], their 13 year old half sister, and [J.B.2], their uncle. Although their mother had custody of them much of the time, she had on-going mental health, substance abuse and legal issues that made it impossible for her to keep the boys safe. [J.B.] was their primary caregiver. * * * [S.B.] was difficult to control and uncooperative about attending school. At times, he visited his father, [G.M.B.], with his mother's consent, but there was no consistent schedule. * * * [S.B.] states that [G.M.B.'s] girlfriend threw [S.B.] and all his toys out of the house the last time he visited his father. He has not seen his father since. [R.B.] was seriously injured, allegedly by his father, [E.M.] in April 2010, leading to four months of foster home placement. He has not seen his father since that time.

* * * [Mother] has a long history of mental health issues, substance abuse and legal troubles and has had an open case with CPS for many years. Her three children have different fathers. [Mother's] first child, [K.B.], born when [Mother] was 16, was placed in her mother's custody at birth. Custody of [R.B. and S.B.] was given to her mother, [J.B.], in November 2011. [Mother] was most recently incarcerated in August 2013 and released November 20, 2013. She is currently homeless and living between friends with no visible means of support. [Mother] listed her friend, Lisa Middleton, as a contact but she is not living there. Lisa

suggested another friend, Miranda Osborn, who sees [Mother] regularly. Both Lisa and Miranda said they would give CASA contact information to [Mother] but she did not respond. [Mother] has not arranged for regular visits with [R.B. and S.B.] but did see them on January 19, 2013 during a rare, unplanned visit with her mother. The boys paid little attention to her, preferring to play video games instead. They are reluctant to talk to her when she calls. During the January 19th visit, [Mother] appeared agitated and weepy. She acknowledged that she needs medication for depression but had not contacted TCN since she does not have a medical card. TCN records confirm that she was discharged from IOP on June 13, 2013 for non-participation. She had started IOP while waiting for a bed at WRC. * * * Fairborn Police reports indicate that [Mother] was transported to SOIN hospital from Lisa Middleton's home on December 21, 2013 due to suspected drug related medical concerns. Additionally, on January 7, 2014, the Fairborn police were called to settle a domestic dispute alleging that [Mother] was unwelcome in Angela Hendrick's home where she had been staying for a few days with Angela's son, Brian Molina.

＊ ＊ ＊

[CSB] has worked with [Mother] for many years with the goal of reunification. * * * [J.B.] was [R.B.'s and S.B.'s] primary caretaker, even before being awarded legal custody in November 2011. [S.B.] did not attend school regularly while in [J.B.'s] care. [S.B.] has repeated both kindergarten and first grade. [J.B.], in failing health, gave [CSB] custody of the boys in April 2013 and

moved to a nursing home. Currently, [Mother] is homeless, unemployed and in need of mental health support. It is unlikely that [Mother's or J.B.'s] situations will change. Efforts to contact the boy's fathers have not been successful. [R.B. and S.B.] were placed in foster care and are doing very well both socially and academically. * * *

Ackerman recommended an award of permanent custody to the agency and that the boys have continuing contact with J.B.

{¶ 16} On March 17, 2014, Kelly Muhammad filed affidavits asserting an inability to locate [Mother].

{¶ 17} On April 1, 2014, a hearing was held on the consolidated cases. Terri Stevenson testified that she is employed at the Troy branch of Darke County Recovery Services as a licensed professional clinical counselor. She stated that she has seen R.B. five times in therapy and S.B. eight times, at the request of CSB, and that the boys' therapy is ongoing. Stevenson stated that she diagnosed R.B. with disruptive behavior and attention deficit disorder, and S.B. with attention deficit disorder. She stated that R.B. appeared to be angry that Mother was in jail. She testified that the boys are too young to understand what is in their best interest. On cross-examination by counsel for Mother, Stevenson stated that the boys have told her that they love their Mother and want to have contact with her. She stated that she has not observed the boys in the presence of Mother. Stevenson testified that the boys' interaction with each other is typical of male siblings. She stated that she did not discuss with the boys the fact that as a result of the hearing, Mother's parental rights may be terminated.

{¶ 18} Lisa Middleton testified that she is a friend of Mother's, and that she resides at

1006 ½ Victoria Avenue. She stated that in December, 2013, Mother resided with her. When asked if Mother stayed there on a regular basis, Middleton replied that Mother "comes and goes," and that she has since "just moved on." Middleton stated that in December, 2013, Mother was at her home and "we were talking. I went to the next room, and when I came back, she was making a loud snoring sound, and I tried to wake her up and she would not respond, so I called the medic." When asked if she asked Mother what had happened that evening, Middleton stated that Mother said "[s]omething about snorting a pill." In response to questioning by the trial court, Middleton indicated that the medics responded to her residence and "tried to wake [Mother] up. They shook her. And they put something in front of her face and she came to." Middlteton stated that Mother was "dazed," and that she left with the medics.

{¶ 19} Kate Messaro testified that she is employed as a family assessment caseworker at CSB. She stated that she became involved with R.B. and S.B. on April 26, 2013. She stated that she reviewed the agency's files prior to the time the case was assigned to her. According to Messaro, CSB's "original concern with [Mother] and her two children * * * came in on March, 2009. There were concerns for her mental health, including some suicide attempts, ongoing issues with cocaine and alcohol use, and inability to maintain stable housing. The case was continually opened from March, 2009 until November, 2011, when [J.B.], maternal grandmother, was awarded custody." When asked why the children came into the agency's care again in 2013, Messaro testified as follows:

> On April 26, the agency received a referral for dependency. The report alleged that [J.B.], who was the custodian, had had a stroke and had been placed in a nursing home. She was unable to care for the children. Initially it was

intended to be a short-term placement * * * .

And upon making contact with [J.B.] at the nursing home, she indicated that she was not going to be leaving the nursing facility and that she had concerns for [Mother's] drug use, and there were no other caregivers for the children at that time.

[J.B.] signed the children into agency custody on a voluntary agreement with care.

{¶ 20} From reviewing Mother's file, Messaro stated that Mother "had been asked to complete mental health and drug and alcohol treatment, and reviewing the 90 day reviews, she had at times engaged in that treatment but had never fully completed a treatment program to resolve the concerns." When asked why the boys could not remain in Mother's care in 2013, Messaro responded that at that time she "learned there was a possibility that [Mother] was going to have her * * * felony probation revoked, and that she potentially had a two-year sentence that she may have to serve due to some concerns for not being compliant with the terms of her probation about seeking drug and alcohol counseling and verifying (sic) her positive drug screens with her probation officer."

{¶ 21} Messaro stated that she investigated possible placements outside of foster care, namely with the boys' fathers. She stated that she "called both fathers and left a voicemail for the father of [S.B.], as well as mailed him a letter to his address that was provided by [Mother], and as well as sent him the court-stamped Complaint and did not receive a response." She further testified that she called [E.M.], "who the agency has history for substantiated physical abuse on (sic). I was contacted by an attorney who was representing him at the time, Lisa Niles.

She initially said that she * * * had explained to him that he would have to be on the case plan, and then on May 20 she contacted me and said that he no longer was interested in seeking custody or being on the case plan * * *." Messaro stated that Mother "indicated to me that [E.M.] had not had any contact with his son in several years due to the substantiated physical abuse. And she indicated that [G.M.B.'s] contact was very sporadic." When asked if Mother or J.B. identified any other relatives or friends who could care for the boys, Messaro testified as follows:

> None that were willing or able. I spoke with [P.L.] who was the maternal
>
> great aunt. She indicated that she has medical issues and she was not able or was
>
> aware (sic) of anyone else who would be able to.
>
> I left a message for [C.S.]. who was another maternal great aunt, and did
>
> not receive a response. I spoke with [B.B.], who is another aunt, who indicated
>
> she lives in senior citizens housing and would not be able to care for the children.
>
> [D.G.], was who [Mother] was residing with at the time. She initially indicated
>
> that she was willing, and the agency submitted a home study request. Due to
>
> some concerns that she was involved with an open case for her own
>
> grandchildren, [D.G.] did contact the agency and retract that request.

{¶ 22} On cross-examination by counsel for Mother, Messaro testified that CSB had an open file for Mother from March of 2009 until November of 2011, and that she was involved from April to May of 2013. She stated that J.B. maintained legal custody of the boys from the end of November, 2011, until J.B. signed a voluntary permit for care on April 29, 2013. Messaro stated that during her involvement in the case, Mother completed a drug and alcohol assessment

at TCN in order to begin an outpatient program while waiting for a bed at the Women's Recovery Center. Messaro stated that at the end of her involvement, Mother had not completed any treatment. Messaro stated that at the time, Mother was living with "[D.G.], a family friend" and also occasionally with J.B. Messaro stated that Mother maintained regular contact with the boys during that time.

{¶ 23} On cross-examination by counsel for G.M.B., Messaro stated that in addition to mailing correspondence to G.M.B., she "also had our intake specialist check the Department of Job and Family services records, and he was listed as an active participant under his paramour, Michelle's contact, and I called the phone number that was listed on that as well and left a voicemail on the phone of a female named Michelle."

{¶ 24} Kelly Muhammad testified that she is a caseworker at CSB, and that she has been R.B.'s and S.B.'s caseworker since April, 2013, having taken over for Messaro. She stated that once the children came into the agency's custody, they were placed together in foster care, where they are doing very well. She stated that a home study was completed on [D.G.], but that she "did withdraw * * * her willingness to take the kids." Muhammad testified as follows regarding the boys:

> They are on schedule. From the beginning when they were first placed there, they were very picky about * * * what they would eat or what they would try to eat, and they are trying new foods.
>
> [S.B.], he had to repeat first grade due to attendance issues prior to coming into care, and he's doing well in school now. Both of the boys are physically healthy. [S.B.] did have a lot of dental work that needed to be done, but that's

been taken care of. Just typical boys, playing, having a good time.

Muhammad stated that the boys have remained in the same placement since coming into the agency's custody. She stated that the boys are bonded to each other, and that all of their needs are being met. Muhammad stated that neither child has special needs. Muhammad stated that Mother was living in J.B.'s home at the time of S.B's poor attendance at school.

{¶ 25} Muhammad testified that she attempted to contact Mother about contacting Stevenson, the boys' counselor, initially at Middleton's home. She testified as follows:

> * * * that's the last known address that I had for [Mother], so I made attempts there. When I found out that she was no longer staying there, I went to a previous police report where [Mother] had a boyfriend who was living in Fairborn. I went to that address. No one answered that particular door. And then my last stop was then to [J.B.'s], and I did leave the counselor's phone number with [J.B.], and [J.B.] said that she can give [Mother] the information when [Mother] calls her, so I asked that she relay that phone number to [Mother.]

{¶ 26} Muhammad testified that the boys "have scheduled visits with [J.B.] every Sunday, and they also have phone calls on Tuesdays and Thursdays * * * . There is no visit currently set up for [Mother]; however, [Mother] has approximately six or seven times gone to [J.B.'s] visits to see the boys," from May of 2013 "until this past Sunday she was at that visit" at the nursing home. She stated CSB attempted to set up visitation for Mother in May or June, 2013, that the boys' foster parents were willing to facilitate visitation, "but we weren't able to get a hold of [Mother.]" The following exchange occurred:

> Q. * * * what did you try to do to contact [Mother] at that time when you

were trying to set up those visits?

A. [Mother] actually did call me one time early on in June and said she needed some bus tokens, so she agreed to meet me at a gas station in Fairborn, and she did not show up at the time. * * * [W]hen I talked to her about it, she thought that a warrant had been issued for her and she was afraid that * * * maybe I would be there with the police to bust her.

But outside of that particular incident, I mailed letters to the last known address at that time that we had for [Mother]. And I believe that was with [Mother] and [J.B.'s] address, with giving her three dates and times to come into the agency to meet with me. She didn't respond to any of those. One of the letters came back. I want to say that was late July.

And so at that point I started to go to [J.B.'s], the visits that [J.B.] had with the kids on Sundays to try and maybe catch [Mother] at those visits. And then it was * * * mid-August when I learned that she was in jail, and then I started going to the jail to see her.

{¶ 27} Muhammad stated that neither boy has had any visitation with their fathers. The following exchange occurred:

Q. * * * Have you made attempts to engage [R.B.'s] father and [S.B.'s] father to have visits?

A. Not to have visits, but just to, you know, see where they wanted, what their involvement was, what they wanted to do where the kids are concerned. Outside of what Kate did in October, I mailed letters to both fathers to see if they

themselves, or if they had relatives, that would be interested in caring for the children.   And [E.M.'s] letter, I believe, came back, but [G.M.B.'s] did not.

* * *

* * * There was a number in the file for [G.M.B.], but when I talked to Kate, she had called that number and didn't get a response, so I didn't know if that is his number or not. * * *.

{¶ 28}   The following exchange occurred:

Q. * * * Now, throughout your handling of this matter, was a case plan developed with the goal of reunifying the children with their mother?

A.   Yes.

* * *

Q.   And what was [Mother] asked to do as part of that case plan?

A.   Mental health and drug and alcohol assessment, submit to random drug screens, sign releases, and show her ability to provide for the kids' basic needs.

Q. * * * And was the agency prepared to assist her in regards to those requirements?

A.   Yes.

Q.   And what of the services that you just identified, what has she been able to accomplish during your handling of this case?

A.   Well, from the beginning she did have the assessment from TCN and they did recommend that she do Women's Recovery, but she did not follow

through with that.

She did - - well, she had the assessment, but she did not get into Women's Recovery. She ended up going to jail. Since I've seen her, since she got out of jail, which I think she got out November of 2013, you know, she's pretty much struggled to have a place to stay or food to eat, so she's not followed through with any of those.

\* \* \*

Q. When she got out of jail, did she contact you?

A. She did get out of jail and contact me. She gave me the 1006 ½ address to meet her at, so - - and I was able to start attending visits at that address.

Q. \* \* \* And how many times did you meet with her from when she got out of jail until the present date today?

A. \* \* \* I've seen her in December at that address. I know that she didn't live there, but stayed there from time to time, so I would make, you know, at least three attempts each month. And in December I was able to catch her at that address on one of those attempts. I believe in January of 2014, I made three attempts and was not successful at it. And then in February, another case worker met her at Lisa's home in February of 2014. Q. \* \* \* And when you would meet her, did you ever ask her to submit to random drug screens?

A. No.

Q. \* \* \* Why did you not ask her to screen?

A. [Mother] was struggling already. You know, when I met her in the

December one, she was tearing up some of the conversation. She said she barely had food to feed herself, that she went days without eating. She doesn't have a consistent place to stay. She didn't have an ID to try and get a job. She didn't have the documents she needed to try and get the ID. Her family was turning their back on her and not willing to help her out, and I just - - some of the times too I didn't have a drug screen with me since I was making attempts, but to me, I mean, that was just unfair to - - I mean, she's already down and out. I didn't want to add to it.

{¶ 29} Muhammad stated that the boys' fathers are not on the case plan because "I have not had any contact with them. They haven't responded to any letters or inquiries. They haven't called to check on the kids, so we didn't add them to the case plan." She stated that the agency moved for permanent custody of the children based upon "the length of time that we've tried to work services with [Mother], the concerns have not really changed from 2009 to today's date. [J.B.] cannot come out of the nursing home to care for the kids. There's no one, no other family member, who has stepped forward to care for the kids. They need permanency." Muhammad stated that it is in the best interest of R.B. and S.B. to be in agency custody, and that if awarded permanent custody, the agency's goal would be to find an adoptive placement and keep them together.

{¶ 30} On cross-examination by counsel for Mother, Muhammad stated that at the time of her initial involvement with the case, "the agreement of care was signed, I believe it was April 29, 2013, and then shortly after the filing with the court was made to give the agency temporary custody." Muhammad stated that Mother was in jail from August, 2013 until the end

of November, 2013, and that Mother requested that the boys visit her in jail. Muhammad testified that "[w]e wanted to check with the counselor to see how she felt about the visits, since the boys were kind of, I don't remember, but they would say I don't remember much about my mom or whatever, so we wanted to learn more on what she could get through counseling before we initiated that." Muhammad stated that visitation at the jail did not occur. Muhammad identified CSB's motion for permanent custody and the following exchange occurred:

Q. * * * And your signature appears on that document?

A. Yes.

Q. * * * And again you filed the report on what date?

A. October 29, 2013.

Q. * * * Now, you checked the boxes that the children are abandoned, the parent had not visited with the child for at least 90 days (inaudible) 2013, correct?

A. Yes.

Q. * * * In fact, my client had visited with the child prior to (inaudible), true?

A. She visited one time, I believe it was in May and one time in June.

Q. * * * And so that check box would be accurate for the two fathers, but not the mother?

A. No.

Q. Correct?

A. From June until she was released from jail, she did not have a visit.

Q. * * * But she wanted to have a visit with the children at the jail, right?

A. Uh-huh.

Q. You don't consider that important?

A. No, it is important.

* * *

Q. * * * And she has visited with the children since her release from jail, is that correct?

A. About four times, yes.

{¶ 31} Muhammad stated that the current foster parents are not interested in adopting the boys.

{¶ 32} On cross-examination by counsel for G.M.B., the following exchange occurred:

Q. You said my client didn't answer to any letters or inquiries, correct?

* * *

A. I went to his house. I left a card on the door. And the next day a woman called me back. She did not leave her name. And it was the Vine Street address. * * * The next day a woman did call me back and she left a message. She did not identify herself, nor did she leave a phone number to call back. She said, you came to my house yesterday. She said that her children were grown and have been out on their own and that she did not want me or anyone else from Children's Services coming back to her door.

Q. And this is the address where you believed that [G.M.B.] lived?

A. This is the same address that we had mailed information to. His information was not returned. I believe it was at the last hearing for PC that was

rescheduled due to the weather that I found out that he actually signed for that paperwork at that address.

{¶ 33}   Joan Ackerman testified that she has visited the children eight to ten times at the nursing home during their visitation with J.B.   Ackerman stated that Mother attended three visits while she was present.   Ackerman stated she discussed the case with Mother and that Mother was "very, very upset, very agitated about it.   She stated they're taking my children away from me, and she's very aware of the process that we're going through."   Ackerman testified that Mother "stated that she was depressed.   She stated that she had no food.   She stated that she didn't have a place to live and she was trying to get things together, and I encouraged her to keep trying."   When asked if Mother ever indicated what her plan was going forward, Ackerman responded, "No specific actions at the time, that she was trying to get work and she was being unsuccessful.   She was, to the best of my knowledge, trying to get some odd jobs in and doing that, but nothing of a routine nature.   And she was just trying to take care of finding a place to live, finding a place to support herself."

{¶ 34}   Ackerman stated that she observed Mother with the boys, and that there "was not a whole lot of interaction between them."   Ackerman stated that the "children come in, and * * * I observed, that the children come in and they are really connected to their grandmother. * * * But they are most connected to the Wii, to the TV, and to kind of get them away from that in that setting is difficult, and they don't give it up to be with their mom * * ."   Ackerman stated that "[t]here were times, [Mother] said, yeah, I really wish you'd turn that off, and but * * * while I was there, it was not turned off."   When asked if the boys appeared to be bonded to Mother, Ackerman replied, "* * * I did not see them really seek her out.   Occasionally she'll kind of

reach over and kind of pull one of them closer to her and clearly try to connect, and they would kind of lean up on that mode for a moment or two and then it was back to the Wii." Ackerman stated, "I don't really feel they're tightly bonded to their mother at this point."

{¶ 35} On cross-examination by counsel for Mother regarding her interim report and final report, the following exchange occurred:

Q. * * * And the wishes of the children when you filed your interim report was?

A. To go with their grandmother.

* *

Q. * * * And the wishes of the children in your investigation report done on January 29 of this year, what were the wishes of the children?

A. They would love to live with their maternal grandmother, [J.B.], again as they did for most of their life.

{¶ 36} When asked if she discussed the meaning of permanent custody with the boys, Ackerman replied, "I have not personally." The following exchange occurred:

Q. * * * Now, have you - - have you met with the boys individually?

A. I spoke with them both individually. I've taken them out and talked with them a little individually, yes.

* * *

Q. Have you met with the child, each boy, and the mother separately?

A. No.

Q. * * * Have you made any efforts to do that?

A. No.

Q. And why is that?

A. Because it seems to me that the children are controlling the situation. It's their time with their grandmother, and I really - - I only remove them from that setting when they express an interest.

{¶ 37} Ackerman stated that she believes it is in the boys' best interest that CSB receive permanent custody, and that their contact with J.B. continue. Ackerman testified as follows:

* * * In the process of establishing - - it was my vision in this process of figuring out what the final permanent custody situation would be, as they remain in foster care, it would be unkind to sever whatever connections they have with somebody they have enjoyed being able to connect with all these months, and so long as that could go on, it seemed to me that would be good for the boys. And we have no way of knowing what will happen after that, but it seemed to me that that would be a good thing, seeing who they cared about and who cared about them.

{¶ 38} When asked, "what's the problem with them also visiting with their mother?", Ackerman stated, "It's my observation that the bond isn't quite as tight. They're not as used to having access to their mom regularly. She's been gone for long periods of time in their lives. The one constant in their life has been their maternal grandmother." When asked if she disagreed with Stevenson's opinion that the children are bonded to Mother, Ackerman replied, "* * * I don't believe Ms. Stevenson has ever seen the children with their mother. * * * [S]he is

judging by the words they say, and children will say I love my mommy and daddy, no matter what in my view. * * * I will not doubt their love for one another. Whether or not they are strongly bonded are two different things in my view."

{¶ 39} On cross-examination by counsel for G.M.B., Ackerman stated, "I tried to find an address for him. I tried to find a telephone number. I was unsuccessful. To tell the truth, I even went on Facebook, * * ** I was not able to find anything there that was successful." She stated that she did not go the address provided by CSB for G.M.B. or send him a letter. Ackerman stated that S.B. told her that G.M.B.'s girlfriend threw all of his toys into the street, and she stated, "I had a sense that he preferred to blame somebody else for his father not being in contact with him than his father. He wanted to have a more positive vision of his father."

{¶ 40} Mother testified that she is staying "with multiple friends," and that she uses the Greene County Job and Family Services location for her mailing address, because "they let you, if you're homeless, you can have your mail sent there." She stated that she has "lived with my mother my whole entire life up until April of 2013. I have had places on my own throughout that time, but I've always been with my mother." She stated that she is not in contact with E.M., and that he has been convicted of child endangering. She described R.B.'s injuries from the incident as follows: "* * * both of my son's shoulders were fractured. His throat had been punctured. He had been burnt with cigarettes. * * * [H]is whole entire mouth at the time had blisters, * * * . He had gashes in his forehead. There was bruises on him, and there was a whole hand print on the lower part of his back." Regarding S.B., Mother stated, "[w]henever he would see his father, he had a great relationship with his father."

{¶ 41} Mother stated that she was involved with CSB from "2009 until 2011 when I

gave full custody of [R.B. and S.B.] to my mom." When asked if she resided with J.B. at the time, Mother responded, "I was, but I was in jail." Mother stated, "At that time I was incarcerated on a probation violation on misdemeanor theft, and I had two new charges of two Felony 5s, forgery and receiving stolen property." Mother testified that she "had did 102 days, and I got put on ISP, which is intensive supervised probation, with Dan Swizler." Mother stated that she was required to "check in weekly," and take weekly drug tests. She stated that she failed a drug test and violated the terms of her probation. Mother stated that she tested positive for cocaine, and "was put in custody, put back in Greene County Jail, where I went back to court and I was put into the Mon[D]ay Program" from April 27, 2012 to October 15, 2012. She stated that she successfully completed the MonDay Program and obtained her GED. Mother stated that she spoke to the boys weekly while she was there, and that "they came and seen me a few times." She stated that when she was released she returned to J.B.'s residence and "then in April, my mom had a stroke and was put into a nursing home, and then that's when [CSB] stepped in and took my sons." Mother stated, "I've been homeless since then. I would stay with friends." According to Mother, her brother and other family members packed J.B.'s things, "but they didn't pack any of my stuff. They threw all my stuff in the trash."

{¶ 42} Since April, 2013 Mother stated she has been back to jail,"[b]ecause I got scared of everything that was going on with Children's Services. I didn't know what to do and I made a bad decision, and I didn't go report to probation and I went on the run" from "June until August" of 2013. Mother stated that she was arrested and served 97 days in the Greene County jail until November 20, 2013. She stated that she is not currently on probation. During the period of April, 2013 until she was incarcerated, Mother stated that she "went and seen [R.B. and S.B.] a

couple times, whenever I could find a ride to Yellow Springs." Mother stated that she does not have a car or a driver's license, and that she "just never have went and got them, but that is something I am working towards now."

{¶ 43} Prior to J.B.'s stroke, Mother stated that she "was with my kids every single day and night," and that she provided them with love and support. She stated that while J.B. had custody of the boys, Mother was not under protective supervision with CSB. When asked how often she has seen her children since her November release from jail, Mother stated, "I want to say at least seven times" at the nursing home on Sundays. She stated that the boys' visits with J.B. are from 12:30 p.m. to 4:30 p.m.

{¶ 44} Mother stated that she never received contact information for Stevenson. She stated that she spoke to Muhammad on the phone, and that Muhammad visited her in jail and advised her "what I needed to do for my kids, which was have a drug and alcohol assessment and mental health assessment." Mother stated that she "did ask for visitation to be set up in Fairborn. I did ask how the boys are doing * * *." Since her release from jail, Mother stated that she has spoken to Muhammad "a couple of times."

{¶ 45} Mother stated that Lisa Middleton is a friend of hers. When asked about the incident at Middleton's home, Mother stated, "apparently I fell asleep and she could not wake me up." Mother denied using drugs at the time. She stated that the medics "took me to Soin Medical Center, and I refused treatment, so they let me go."

{¶ 46} Mother stated that she has met with Ackerman three times while visiting the boys at the nursing home. She stated that she has not met with Ackerman alone. Mother testified as follows regarding her visits at the nursing home:

Well, when it's warm out, we go outside onto the playground and play, because there is a playground at Friends Care, and bikes and everything for them to ride. We go out there and they play on the slides and swings and they ride the little bikes that are outside, and I take pictures. And I have a lot of pictures that are at Friends Care with them. We would walk around the pond.

But as far as when it's cold out, my mom did buy them a Wii, and they do play the Wii while they're there, and they're very - - they love their Wii. They have always, especially [S.B.], he loves the Wii, and now that [R.B.] knows how to play as well, he loves it too.

{¶ 47} Mother stated that she obtained a job at T.J. Chumps in Fairborn, and that she is "supposed to either go in tonight or tomorrow" for the first time. She stated that she "will be in the kitchen. I will be a dishwasher and prep, and they have pizzas, which I will be learning how to make all the pizzas and just cleaning up, doing all of that kind of duties." Mother stated that she will earn $8.50 an hour, and that she will work 30 hours or more a week.

{¶ 48} Mother stated that she has health care coverage from CareSource, and that she "just got it back in March." She stated that she is not receiving food stamps but that she hopes to receive them soon. Mother stated that she plans to "get an apartment and keep my job." Mother stated that she had difficulty finding a job "because of being a felon." When asked if she is in a position to take the boys home, Mother responded, "[n]o, not today, I'm not." She stated that she "would like to ask for more time. I know I have struggled big time, but I truly am trying my hardest right now to get it together, and I love my kids and I do not want to lose them." Mother stated that she will "have a mental health assessment done," as well as an assessment for

drugs and alcohol abuse.   Mother testified that she is not currently using drugs.    Mother stated that she does not have a telephone.

**{¶ 49}**   On cross-examination by CSB, Mother acknowledged that she needs mental health treatment because "I do have depression."   Mother stated that while she was "on the run," she did not contact Muhammad to set up visits.   Mother testified, "before I went on the run, I had asked for visitation to be set up in Fairborn, which was never set up.   Due to I didn't have a way for her to get ahold of me, everything was a mess.   After I got - - when I was in jail, I asked for visitation.   That never happened. And when I got out in November, I asked again for visitation to be set up in Fairborn."   Mother stated that she gave Middleton's phone number and address to Muhhamad, but that she was not always at that address.   Mother acknowledged that it was extremely difficult for anyone to contact her after her release from jail.

**{¶ 50}**   The following exchange occurred:

Q. * * * And when you see your children, it's during their visits with their grandmother, correct?

A.   Yes.   Because no visitation has ever been set up for me, yes.

Q.   And is it fair to say that even if visitation had been set up, you still didn't make contact with the case worker since January?

A.   Visitation should have already been set up, though. * * *

Q.   Is it fair to say that you haven't attempted to contact the case worker, other than one phone call in January, to work the case plan?

A.   No.   I have called her multiple times, but she is never in the office.

Q.   And did you leave her a message?

A. No, because there is no phone number for me to give her to call me back that I'm around long enough.

{¶ 51} Mother acknowledged that she was able to get a ride home from Soin Medical Center on short notice, and when asked why she is unable to get a ride to CSB, she replied, "[th]he people that I am involved with today are people who work * * * and they work, so no, I don't have a reliable ride to get over there right now." Mother stated that she hoped to have stable housing for the boys "within the next few months." Mother stated that she has a third child in agency custody. She acknowledged that she has been incarcerated three times since 2009.

{¶ 52} Mother stated that when she lived with J.B. and the boys at J.B.'s home, she bathed the boys, cooked for them and played with them. When asked about S.B.'s poor attendance at school, Mother stated that it was "because my mom was in bad health, * * * we were struggling a little bit, because I was trying to take care of both my mom and the kids." Mother stated that S.B. rode the bus to school and that "[w]e would run late sometimes." Mother denied that it would be difficult for CSB to contact her today because "I talk to my mother on a regular basis now, and I'm really trying a lot harder and I'm really trying to get my life together, as long as it is written down exactly how it needs to be said to me, because she does forget things."

{¶ 53} On cross-examination by counsel for G.M.B., Mother stated that she believes that it is in S.B.'s best interest for G.M.B. to have custody of the boys rather than CSB. On redirect examination, Mother stated that in May of 2013 she "went to the hospital and they had ran some tests and I had pancreatitis and my liver was shutting down and my gallbladder, and they removed my gallbladder in that time, and I have not had no further issues with any of it."

{¶ 54} In response to questioning by the trial court regarding her living arrangements with friends, Mother stated, "I'll stay one night; I'll go somewhere else, because I don't try to be a burden on any of these people." Mother stated that she filled out an application at T.J. Chumps, and that "they are completely and fully aware of my full background, and they know I'm going through this right now with my kids." When asked about her work schedule, Mother stated, "[i]t's either tonight or tomorrow that I go for orientation, then I'm put onto the schedule." Mother testified that her "friend actually works there and they were going to pick me up and take me back and forth, wherever I need to go. I just have to give them a call." When asked by the court when she last consumed drugs or alcohol, Mother replied, "It's been since before I got locked up again." Mother testified that "the only thing I have used since I got out of the Mon[D]ay Program in October of 2012 was Vicodin that I had a prescription for, and that was through probation. That was from having my teeth pulled, but yeah, that was the only one that I am aware of. One time, one other time, yes, sir, in November of 2012, I did relapse once, yes, I did." Finally, the court clarified that Mother asserted that she had not used any alcohol or drugs since January of 2013, and that she was currently not on any prescription medication.

{¶ 55} G.M.B. was called to testify, and when asked to provide his current address, he replied, "I don't know right offhand." He acknowledged that he is "bouncing around from home to home right now." He stated that he had been staying with his girlfriend, Michelle, "but we had a bad break-up and everything, and so I had to move out of there." He stated that the break-up occurred eight or nine months ago. G.M.B. stated that he works at Burger King "off East Dayton-Yellow Springs Road," and that he has worked there for almost four years. He stated that he does not have a felony record, and that he dropped out of high school. He stated

that he is not drug or alcohol dependent. G.M.B. stated that he is healthy. When asked how he felt about the proceedings in court, G.M.B. stated, "I feel, you know, a little depressed, sad about it. The current situation, plus, you know, me going through some problems of my own." According to G.M.B., "Michelle and, you know, [Mother] they had some problems, and Michelle, you know, she got mad about it, and she did, you know, set some toys and stuff out into the yard, and she did say she didn't want [S.B.] to come back, you know, because of the problems they had." G.M.B. stated that S.B. used to spend the night often, but that he hasn't seen S.B. since March of 2013.

{¶ 56} G.M.B. acknowledged receiving correspondence from CSB regarding the custody of S.B., and when asked why he did not contact the agency to see what he could do for his son, he responded, "I didn't think I was in the best position and like, you know, to try to get him back, you know, because of my kind of situation." He stated that he hoped Mother would regain custody. G.M.B. stated that he wanted more time to seek housing and to get custody of S.B.

{¶ 57} On April 2, 2014, the trial court issued entries which provided that at the conclusion of the hearing, Mother and G.M.B. submitted to drug screens and noted that it would rule on CSB's motion in separate entries. In its subsequent entries, the court made factual findings consistent with the testimony of the witnesses. Regarding the court-ordered drug screens, the court noted that on "the form used for this screen, [Mother] acknowledged using marijuana, and the test results confirm such."

{¶ 58} The court noted that "[i]t is the therapist's viewpoint that neither child is capable of understanding what is in his best interest, in terms of a living arrangement." The court noted as follows:

Since 2009, a variety of factors have rendered [Mother] incapable of adequately meeting the needs of the children; chronic substance abuse, recurring mental health issues, and lack of independent and stable housing. In this current agency involvement, case plan services were offered to [Mother] to address these issues. The agency offered [Mother] transportation assistance so that she could connect with service providers; however, [Mother] would not avail herself of the agency's help, nor otherwise participate in case plan activities to remedy these concerns. Instead, she continued to abuse drugs. The Court does not believe [Mother's] explanation of the 12/21/13 incident that she "just fell asleep"; rather, the Court believes Ms. Middleton's testimony that [Mother] told Lisa that she "snorted a pill". This drug use rendered her unresponsive and in need of medical intervention. Further, it is clear from the drug screen performed after the hearing that [Mother] lied when she testified that she has been drug-free since a single relapse last November. Under the circumstances of [Mother's] transience and difficulty to contact, the agency made reasonable case planning and diligent efforts to assist [Mother] to remedy the problems that caused the children to be placed outside their home. [Mother] always had the case worker's phone number but called her sporadically. [Mother] has failed continuously and repeatedly to substantially remedy the conditions that caused the children to be placed outside the home.

* * * The Court finds that [Mother's] stated intent to now get substance abuse and mental health treatment, maintain employment and pursue independent housing is far outweighed by her demonstrated failure to address these issues over

the past five years.   The Court finds that neither [S.B.] nor [R.B.] can be placed with [Mother] within a reasonable time.

{¶ 59}   Regarding R.B., the court noted as follows:

* * * After the agency became involved with this family in April, 2013, the caseworker contacted [E.M.] to notify him of the agency's involvement and inquire as to whether he had any interest in [R.B.].   The case worker received a response from [E.M.'s] attorney indicating that [E.M.] had no interest. [E.M.] has not had any contact with [R.B.] since 2010.   He has abandoned [R.B.]. [R.B.] cannot and should not be placed with his father within a reasonable time.

* * * Despite a reasonable effort by the agency to locate a suitable relative placement, no such alternative was identified.

* * * [R.B.] needs a legally secure permanent placement which cannot be achieved without a grant of permanent custody to the agency.   The agency's permanency plan is to seek an adoptive placement for [R.B.] and his brother.   It is not in [R.B.'s] best interest to have [Mother's] demonstrated lack of commitment to this child delay proceeding with this plan.   The G.A.L. has recommended that the child be placed into the agency's permanent   custody.

* * * It is in the best interest [of R.B.] to be in the permanent custody of the agency.

{¶ 60}   Regarding S.B., the court determined as follows:

[G.M.B.] broke up with his girlfriend, with whom he shared an apartment, eight to nine months before the 4/1/14 hearing.   He has been staying with friends.

[G.M.B.] has been employed at a Burger King Restaurant for about four years. He had visits with [S.B.] prior to the agency's current involvement. These visits included overnight stays and were positive experiences for the child. His last contact or visit with the child was in March, 2013; [G.M.B.] provided no explanation for this. [S.B.] has been abandoned by his father. [G.M.B.] admits that he is not currently in a position to meet [S.B.'s] needs. He would like to be given that opportunity. He was aware that this case has been in existence since May, 2013, and stipulated that he made no attempt to contact the agency. Despite testifying that he did not use drugs, [G.M.B.] tested positive for marijuana after the hearing. [S.B.] cannot be placed with his father within a reasonable period of time.

* * * Despite a reasonable effort by the agency to locate a suitable relative placement, no such alternative was identified.

* * * [S.B.] needs a legally secure permanent placement which cannot be achieved without a grant of permanent custody to the agency. The agency's permanency plan is to seek an adoptive placement for [S.B.] and his brother. It is not in [S.B.'s] best interest to have the parents' demonstrated lack of commitment to this child delay proceeding with this plan. The G.A.L. has recommended that the child be placed into the agency's permanent custody.

* * * It is in [S.B.'s] best interest to be in the permanent custody of the agency.

{¶ 61} Mother asserts four assignments of error. We will consider her first two assigned errors together. They are as follows:

"THE TRIAL COURT ERRED IN FINDING THAT THE CHILDREN COULD NOT BE RETURNED TO EITHER PARENT WITHIN A REASONABLE AMOUNT OF TIME, BECAUSE SUCH FINDING IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE," And,

"THE TRIAL COURT ERRED IN FINDING THAT IT WAS IN THE CHILDREN'S BEST INTEREST TO BE PLACED IN THE PERMANENT CUSTODY OF THE AGENCY, BECAUSE SUCH FINDING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

"a.   The boys were not abandoned."

"b.   The court applied the wrong 'start date' for whether the children could be placed with either parent within a reasonable time."

"c.   The statutory best interest factors were not established."

**{¶ 62}**   As this Court has noted:

A children services agency that has been awarded temporary custody of a child may move for permanent custody. R.C. 2151.413(A). Before the court may award the agency permanent custody of a child, the court must conduct a hearing. R.C. 2151.414(A)(1).

A trial court may not grant a permanent custody motion unless the court determines that (1) it is in the best interest of the child to grant the agency permanent custody, and (2) one of the conditions set forth in R.C. 2151.414(B)(1)(a)-(d) exists.

*In re J.E.*, 2d Dist. Clark No. 07-CA-68, 2008-Ohio-1308, ¶ 8-9.

**{¶ 63}** R.C. 2151.414 provides in relevant part as follows:

(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

* * *

R.C. 2151.011(C) provides that "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days."

**{¶ 64}** R.C. 2151.414 further provides as follows regarding the best interest of the child:

(D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section * * * the court shall consider all relevant factors, including but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child  * * *.

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶ 65}** As this Court has noted:

Not every statutory condition must be met before a determination regarding best interest may be made. See *In re K.H.*, 2d Dist. Clark No.2009-CA-80, 2010-Ohio-1609, at ¶ 57; *In re A.M.L.B.*, 9th Dist. Wayne No. 08CA0028, 2008-Ohio-4944, at ¶ 8 (holding that "[t]he trial court did not err by failing to discuss an irrelevant best interest factor").    And no one statutory factor is more important than any other. See *In re Schaefer*, 111 Ohio St.3d 498,

2006-Ohio-5513, 857 N.E.2d 532, at ¶ 56.

*In re R.L.*, 2d Dist. Greene Nos. 2012CA32, 2012CA33, 2012-Ohio-6049, ¶ 18.

**{¶ 66}** R.C. 2151.414 further provides:

(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing

parental conduct to allow them to resume and maintain parental duties.

    \* \* \*

    (10) The parent has abandoned the child.

**{¶ 67}** As this Court has previously noted:

    "Clear and convincing evidence is that level of proof which would cause the trier of fact to develop a firm belief or conviction as to the facts sought to be proven."_ *In re Dylan C* . (1997), 121 Ohio App.3d 115, 121, 699 N.E.2d 107, citation omitted. "An appellate court will not reverse a trial court's determination concerning parental rights and child custody unless the

determination is not supported by sufficient evidence to meet the clear

and convincing standard of proof." Id., citation omitted.

    "When a judgment is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *In re Conner*, Montgomery App. No. 18808, 2001-Ohio-1693, 2001 WL 1345955, at \*1, citation omitted. "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the [judgment].' " Id., citation omitted.

*In re Rishforth*, 2d Dist. Montgomery No. 20915, 2005-Ohio-5007, ¶ 11-12.

{¶ 68} Mother initially asserts that she "never abandoned her children. * * * Even as it regards[] [G.M.B.], the record suggests that the agency chose not to make a reasonable effort at making contact with him regarding his child, and in so far as they did make an effort, it was not geared toward reunification."

{¶ 69} We initially note that the trial court did not conclude that Mother abandoned her children, pursuant to R.C. 2151.414(B)(1)(b), but it found, pursuant to R.C. 2151.414(B)(1)(a), that neither child could be placed with Mother within a reasonable time, despite CSB's reasonable case planning and diligent efforts to assist Mother in remedying the problems that led to the boys being placed in foster care.

{¶ 70} Regarding G.M.B., Messaro stated that she left him a voicemail, mailed him a letter, and sent him the court-stamped complaint without a response. She stated that Mother indicated to her that G.M.B.'s contact with S.B. was "very sporadic." Muhammad stated that G.M.B. is not on the case plan because she has not had any contact with him, and that he has not responded to any letter or inquiries. She stated that she went to the address given to her for G.M.B. and left a note, and that the only response was from an unidentified woman who did not leave a phone number. G.M.B. acknowledged that he received correspondence from CSB regarding S.B., but that he did not respond "because of my kind of situation." We conclude that the agency's efforts to contact G.M.B. were reasonable.

{¶ 71} As the court noted, at the time of the hearing, G.M.B. had not seen S.B. in over a year, without explanation. According to G.M.B., during a visit with S.B., G.M.B's girlfriend threw S.B.'s toys "out in the yard, and she did say she didn't want [S.B.] to come back."

G.M.B. is homeless, and he further acknowledged that he is unable to meet his son's needs. G.M.B. testified that he hoped Mother would regain custody. Having reviewed all the evidence, we cannot conclude that the trial court's determination that G.M.B. abandoned S.B. is against the manifest weight of the evidence.

{¶ 72} Mother cites R.C. 2151.414(E)(1) and asserts that the "court should have based when it 'started the clock' on the text of the statute, i.e.,from the time the children were placed outside of the home, at the end of April, 2013, rather than when the agency first became involved with the family, because doing so was prejudicial and clearly inconsistent with what the General Assembly intended."

{¶ 73} Mother further asserts as follows:

While it is not disputed that the agency's first involvement began in 2009, it is a misstatement of the facts to say that it has been involved "since" that time, and that it has been, for its part, making diligent efforts at assisting mother in her efforts to remedy the obstacles she faces to providing for her kids. As stated above, there was no agency involvement [whatsoever] for more than a year prior to the children coming into care. Even then, the agency only removed the children when it became clear that [J.B.] would not return home. Up until that point, the agency was apparently satisfied that mother could care for the boys, at least for a short time.

At the time of the hearing, the only major obstacle with placing the boys with mother was housing. She was employed. She had substantially, if not fully remedied, any issues related to substance abuse, and it had been less than 9

months earlier that the boys had been adjudicated dependent and temporary custody granted to the agency. She had come a long way, as these cases go, in a short amount of time.

**{¶ 74}** We initially note that the trial court did not state that CSB was involved with Mother since 2009; the court indicated that "[s]ince 2009, a variety of factors have rendered [Mother] incapable of adequately meeting the needs of the children." We further note that the court distinguished the "agency's initial involvement" with Mother in 2009 from "[t]his current agency involvement" herein. Even if consideration of Mother's conduct is limited to the time period of April, 2013, to the April, 2014 hearing, it is clear that she did not "come a long way in a short amount of time" as she asserts. CSB accepted a dependency report regarding the children on April 26, 2013. In May of 2013, the court awarded interim custody of the boys to CSB. The agency's May 15, 2013 complaint alleged that J.B. had a stroke and initially left the boys in Mother's care in March, 2013, then signed the boys into the temporary custody of the agency, and that Mother was on probation and possibly going to jail. At that time, J.B. expressed concerns about Mother's drug use, according to Messaro's testimony. In June, 2013, Muhammand filed an affidavit averring her inability to locate Mother. Mother testified that she went "on the run" from June until August of 2013. In July, 2013, the court granted temporary custody to CSB and noted that Mother is drug dependent and has a warrant out for her arrest. On October 29, 2013, CSB sought permanent custody, noting that the caseworker was unable to meet with Mother from April 30, 2013 until mid-August due to Mother's lack of cooperation, that Mother is incarcerated, and that she has no place to go upon her release. Mother was in jail from August, 2013 until November, 2013. Muhammad stated that Mother failed to meet her in Fairborn for bus tokens

because she was afraid that Muhammed "would be there with the police to bust her." Muhammad stated that Mother struggled to find a place to stay and food to eat upon her release from jail. She stated that she "was able to catch" Mother once in December, and that she made three unsuccessful attempts to locate her in January. Ackerman's January 9, 2014 report provides that Mother did not arrange for visitation with the boys, that she was taken to the hospital in December, 2013, for a suspected drug-related episode, and that she was involved in a domestic dispute on January 7, 2014. On March 17, 2014, Muhammad filed affidavits averring an inability to locate Mother.

{¶ 75} At the April 1, 2014 hearing, while Mother indicated that she had obtained employment, she had yet to work her first day, she was dependent upon a friend for transportation, she was homeless, and she lied to the court about her drug usage, subsequently testing positive for marijuana. As noted above, as to G.M.B., the court correctly concluded that he abandoned S.B. For the foregoing reasons, we cannot conclude that the "court applied the wrong 'start date'" or erred in determining that the children could not be placed with Mother or G.M.B. within a reasonable time.

{¶ 76} Finally, Mother asserts that the "statutory best interest factors were not established." According to Mother, she "and grandmother essentially co-parented the boys. Thus, it would be natural for them to want to go with their grandmother given the fact that mother's parenting had been inconsistent. But this does not equate to desiring to be adopted rather than reunited with their mother in the event the grandmother would no longer be able to be the primary custodian."

{¶ 77} The record supports a finding that an award of permanent custody in favor of

CSB was in the children's best interest. Regarding the boys' interactions and interrelationships with their parents, relatives and foster parents, as noted above, G.M.B. abandoned S.B. Messaro testified that she learned from E.M.'s attorney that he did not want to be involved in the custody dispute, and the trial court correctly found that he abandoned R.B. There were no other family members available to take care of the children; Messaro testified that she contacted multiple potential placements. As to Mother, Stevenson testified that R.B. exhibited anger that Mother was in jail. She stated that the boys told her that they love Mother, but she did not observe them in Mother's presence. Ackerman stated that in her experience, children will say they love their parents "no matter what," and that in her observation, the boys "were not tightly bonded" to Mother. She testified that the boys chose to play video games rather than interact with Mother. The boys indicated to Ackerman that they wanted to live with J.B. Ackerman stated that all of the boys' needs are being met by their foster parents. Muhammad testified that the children are bonded to each other, that they are doing well in foster care, and that S.B.'s school performance has improved.

{¶ 78} Regarding the wishes of the children, Ackerman's reports provide that the boys want to reside with J.B., and their wishes support Ackerman's conclusion that a bond between the boys and Mother is lacking. It is evident from the court's decision that the court gave due regard to the boys' lack of maturity to discern their best interest, consistent with Stevenson's testimony. Muhammad and Ackerman testified that it is in the boys' best interest to be in the custody of CSB.

{¶ 79} Regarding the custodial history of the boys, the record reflects that Mother, with the exception of a brief period between March and the end of April, 2013, has never parented the

children independently. She resided in J.B.'s home with the boys, and at the time of J.B.'s stroke, J.B. indicated to CSB that she had concerns about Mother's drug use.

{¶ 80} The court expressly considered the children's need for a legally secure placement, and whether such a placement can be achieved without a grant of permanent custody to CSB. Muhammad testified that the boys need permanency. Messaro testified that in addition to the boys' fathers, she contacted two maternal great aunts, another aunt, and a friend of Mother's with whom Mother resided, but that none of them were able to care for the boys. Since being placed into the temporary custody of CSB, the boys have been in the same placement together, and Muhammad stated that the agency's goal is to keep the boys together and find an adoptive home for them.

{¶ 81} Finally, the factor set forth in R.C. 2151.414(E)(10), namely that the "parent has abandoned the child," applies to E.M. and G.M.B.

{¶ 82} Having reviewed the entire record, and deferring to the trial court's assessment of credibility, we conclude that the trial court's findings that R.B. and S.B. could not be returned to Mother within a reasonable time, that the boys were abandoned by their fathers and could not and should not be placed with them within a reasonable time, and that it was in the best interest of the boys to award permanent custody of them to CSB, are all supported by sufficient evidence to meet the clear and convincing standard of proof. Accordingly, Mother's first two assigned errors are overruled.

{¶ 83} Mother's third assigned error is as follows:

"THE TRIAL COURT ERRED IN NOT DISCOUNTING THE CASA'S RECOMMENDATION IN LIGHT OF HER SUBSTANTIAL NON-COMPLIANCE WITH

THE RULES OF SUPERINTENDENCE OF THE COURTS OF OHIO AND WAS IN ANY EVENT NOT LEGALLY POSSIBLE."

{¶ 84}   Mother asserts that Ackerman failed to comply with Rule 48 (D) of the Rules of Superintendence for the Courts of Ohio. She asserts that Ackerman "never discussed the nature of permanent custody with the boys."   Mother asserts that there is an "inherent conflict" in Ackerman's recommendation that CSB receive permanent custody, but that the boys continue to visit J.B., and that "the court should have taken her equivocation as a signal that granting permanent custody, at least at this stage in the case, would be premature."

{¶ 85}   Sup. R. Rule 48 (D)(13) provides in relevant part:

A guardian ad litem shall make reasonable efforts to become informed about the facts of the case and to contact all parties. In order to provide the court with relevant information and an informed recommendation as to the child's best interest, a guardian ad litem shall, at a minimum, do the following, unless impracticable or inadvisable because of the age of the child or the specific circumstances of a particular case:

(a) Meet with and interview the child and observe the child with each parent, foster parent, guardian or physical custodian and conduct at least one interview with the child where none of these individuals is present;

* * *

(c) Ascertain the wishes of the child;

(d) Meet with and interview the parties, foster parents and other significant individuals who may have relevant knowledge regarding the issues of the case;

\* \* \*

**{¶ 86}**   As this Court has noted:

\* \* \* "Sup.R. 48 does not have the force of law." *Nolan v. Nolan*, 4th Dist. Scioto No. 11CA3444, 2012-Ohio-3736, ¶ 26. Rather, the rule, like all Superintendence Rules, is an administrative directive. *See Pettit v. Pettit*, 12th Dist. Fayette No. CA2011-08-018, 2012-Ohio-1801, ¶ 12 (saying that the rules are "administrative directives only, and are not intended to function as rules of practice and procedure"). This means that the rule does not create any individual rights. *See id*. (saying that the rules "are purely internal housekeeping rules which are of concern to the judges of the several courts but create no rights in individual defendants"); *Nolan* at ¶ 26 ("Ohio appellate courts have indicated that the Rules of Superintendence are general guidelines for the conduct of the courts and do not create substantive rights in individuals or procedural law."). Accordingly, whether to consider the report of a GAL when the GAL did not fully comply with Sup.R. 48(D) is within a trial court's discretion. \* \* \* .

*Corey v. Corey*, 2d Dist. Greene No. 2013-CA-73, 2014-Ohio-3258, ¶ 9.

**{¶ 87}**   Ackerman's report provides as follows:

| Person Interviewed/Observed | Relationship to the Child |
|---|---|
| R.B. | Child |
| S.B. | Child |
| [Mother] | Mother |
| [J.B.] | Maternal Grandmother |
| [J.B.2] | Maternal Uncle |
| XXXXXXX | Foster Mother |
| XXXXXXX | Foster Father |
| Alicia Gross | Secretary, Bethel Elementary School |
| Lauren Worman | First Grade Teacher, Bethel Elementary School |

```
Teri Stephenson..............................Family Youth Specialist, SAFY
Holly Welther..................................Caseworker, SAFY
[M.L.].............................................First cousin, [Mother]
Lisa Middleton................................Friend, [Mother]
Miranda Osborn..............................Friend, [Mother]
Amy Keck.......................................TCN
Dan Getty.......................................Attorney, G.M.B.
```

**{¶ 88}** Regarding G.M.B. and E.M., the report provides that Ackerman made "multiple inquiries; no known contact information". The report further provides:

> **Daniel Getty** is the court appointed attorney for [G.M.B.]. On January 16, 2013, a representative from his office contacted the CASA office about conferring with CASA for RB & SB. As requested, the CASA set up a time for a phone conference on January 20, 2013. However, the call never came. There was no further contact from anyone in Mr. Getty's office until January 23, 2013, when the CASA office again was contacted requesting another phone conference with the CASA. However, the CASA was unable to reschedule.

**{¶ 89}** It was within the trial court's discretion to consider Ackerman's recommendation, and her testimony and report reveal that she made reasonable efforts to become informed about the facts of the case and contact all parties. Regarding her failure to meet with each boy separately in the presence of Mother, and her failure to discuss the nature of permanent custody with the boys, Ackerman testified that in the course of the boys' visits with J.B., "I only remove them from that setting when they express an interest," and we conclude that Ackerman may have believed that removing the boys individually with Mother, or discussing the nature of permanent custody with them, was impracticable or inadvisable because of their ages and further due to the lack of a bond between Mother and the boys. We conclude that Mother's third

assignment of error lacks merit, and it is overruled.

{¶ 90} Mother's fourth assigned error is as follows:

"THE TRIAL COURT ERRED IN FAILING TO APPOINT AN ATTORNEY FOR THE MINOR CHILDREN WHEN IT BECAME APPARENT THAT THE CASA'S RECOMMENDATION WAS INCONSISTENT WITH THE CHILDREN'S WISHES."

{¶ 91} Mother relies upon Sup.R. 48(D)(8) and (10), which provide as follows: "(8) When a guardian ad litem determines that a conflict exists between the child's best interest and the child's wishes, the guardian ad litem shall, at the earliest practical time, request in writing that the court promptly resolve the conflict by entering appropriate orders," and "(10) Upon becoming aware of any actual or apparent conflict of interest, a guardian ad litem shall immediately take action to resolve the conflict, shall advise the court and the parties of the action taken and may resign from the matter with leave of court, or seek court direction as necessary. Because a conflict of interest may arise at any time, a guardian ad litem has an ongoing duty to comply with this division." Mother asserts that the "record could reasonably be read to imply that the CASA purposely avoided discussing the finality of permanent custody as an attempt to avoid a conflict and the court had enough before it to either find one or impute one."

{¶ 92} As CSB asserts, Mother failed to raise this issue below; however, even if we were to conclude that the court erred in failing to appoint counsel for the children, prejudice is not demonstrated, and the error is harmless.

{¶ 93} R.C. 2151.352 provides:

A child or the child's parents, custodian, or other person in loco parentis of such child is entitled to representation by legal counsel at all stages of the

proceedings under this chapter or Chapter 2152. of the Revised Code. If, as an indigent person, a party is unable to employ counsel, the party is entitled to have counsel provided for the person * * *. Counsel must be provided for a child not represented by the child's parent, guardian, or custodian. If the interests of two or more such parties conflict, separate counsel shall be provided for each of them.

{¶ 94} Juv.R. 4(A) provides:

Every party shall have the right to be represented by counsel and every child, parent, custodian, or other person in loco parentis the right to appointed counsel if indigent. These rights shall arise when a person becomes a party to a juvenile court proceeding. When the complaint alleges that a child is an abused child, the court must appoint an attorney to represent the interests of the child. This rule shall not be construed to provide for a right to appointed counsel in cases in which that right is not otherwise provided for by constitution or statute.

{¶ 95} Juv.R. (2)(Y) provides: "'Party' means a child who is the subject of a juvenile court proceeding, the child's spouse, if any, the child's parent or parents, or if the parent of a child is a child, the parent of that parent, in appropriate cases, the child's custodian, guardian, or guardian ad litem, the state, and any other person specifically designated by the court."

{¶ 96} In *In re Wiliams*, 101 Ohio St.3d 398, 2004-Ohio-1500, 805 N.E.2d 1110, ¶ 29, the Supreme Court of Ohio held that "pursuant to R.C. 2151.352, as clarified by Juv.R. 4(A) and Juv.R. 2(Y), a child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding and, therefore, is entitled to independent counsel in certain circumstances."

**{¶ 97}** In *In* re *T.J.*, 2d Dist. Montgomery No. 23032, 2009-Ohio-1290, ¶ 8, this Court noted:

"The circumstances which the Supreme Court addressed in *Williams* arise when a guardian ad litem who is also appointed as the juvenile's attorney recommends a disposition in a permanent custody proceeding that conflicts with the juvenile's wishes. The juvenile court must then appoint independent counsel to represent the child, because 'the duty of a guardian ad litem to a ward [to recommend to the court what the guardian feels is in the best interest of the ward] and the duty of a lawyer to a client [to provide zealous representation] may be in fundamental conflict in a dual-representation situation.'" *In re H.R., H.R. & E.R.*, Montgomery App. No. 21274, 2006-Ohio-1595, ¶ 6, quoting *Williams*, 101 Ohio St.3d at 403, 805 N.E.2d 1110.

**{¶ 98}** Ackerman recommended that the court award custody of the boys to CSB. R.B. and S.B. expressed a desire to reside with J.B., which was an impossibility, due to her failing health. Accordingly, to appoint counsel to zealously advocate the boys' wishes regarding their desired living arrangement would have been a futile exercise. Most significantly, given the overwhelming evidence that it is in the best interest of the boys to grant CSB permanent custody, and the overwhelming evidence that the children cannot or should not be placed with Mother, prejudice is not demonstrated. Accordingly, Mother's fourth assigned error lacks merit, and it is overruled.

**{¶ 99}** The judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, P.J. and WELBAUM, J., concur.

Copies mailed to:

Brittany M. Hensley
Carl Bryan
Daniel F. Getty
Joan Ackerman
Hon. Robert W. Hutcheson